United States Courts
Southern District of Texas
FILED

AUG 15 2016

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON, DIVISION

| | | |
|---|---|---|
| SPECIALIZED POWER LOGISTICS LLC, | § § § § § § § § § § § | |
| Plaintiff, | | |
| vs. | | CAUSE NO.: _____ |
| | | (Civil) |
| BERGE PROJECT CARGO, S.L., and BERGE SHIPPING, | | |
| Defendants. | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW, Plaintiff, Specialized Power Logistics, LLC (SPL), complaining of Defendant, Berge Project Cargo, S.L. (BPC) and Berge Shipping (BS), (collectively Berge), and for cause would respectfully show unto the Court as follows:

### PARTIES

1. Specialized Power Logistics, LLC, (SPL), is a limited liability company, organized and existing pursuant to the laws of the state of Texas. SPL has a principle office located at 440 Benmar Drive, Suite 3040, Houston, Texas.

2. Berge Project Cargo, S.L. (BPC) a foreign business entity organized and existing pursuant to the laws of the Kingdom of Spain.  Berge Shipping (BS) is an affiliate, subsidiary or d/b/a of BPC. BPC and BS have a principle office located at Calle Alcalá 65, E-28014 Madrid, Spain.

3. BPC and BS collectively shall hereinafter be called Berge.

1

## JURISDICTION AND VENUE

4. This Court has jurisdiction of this cause under 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds SEVENTY FIVE THOUSAND ($75,000.00) and NO/100 DOLLARS.

   Venue is proper in this Court under 28 U.S.C. 1391 §§ (a) and (b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in Houston, Texas

## SERVICE OF PROCESS

5. The Kingdom of Spain ratified the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, also called the Hague Service Convention, on June 4, 1987, and its provisions entered into force on August 3 of the same year.

6. The United States of America ratified the Convention of 15 November 1965 on the Service Abroad of Judicial or Extrajudicial Documents in 1969.

7. Under United States law, attorneys representing parties in courts within the United States are competent authorities to prepare and submit requests for service going to foreign Central Authorities. See Rule 4 of the Federal Rules of Civil Procedure (FRCP); *Holloway v. Arkansas*, 435 U.S. 475 (1978); see also *Charleston Aluminum, LLC v. Ulbrinox S. De R.L. de S.V.*, No. 3:12–2389–MBS, 2013 WL 152895 (D.S.C. Jan. 15, 2013); *Coombs v. Iorio*, No. CIV-06-060-SPS, 2008 WL 4104529 (E.D. Okla. Aug. 28, 2008); *Marschauser v. Travelers Indemnity Co.*, 145 F.R.D. 605, 607 (S.D. Fla.1992).

8. Spain's Hague Central Authority is:

Subdirección General de Cooperación Jurídica Internacional
Ministerio de Justicia
c/ San Bernardo N° 62
28071 MADRID
Spain

Accordingly, Berge may be served with process by forwarding, by certified mail return receipt requested, a copy and certified translated copy of Plaintiff's Original Complaint and Summons to Spain's Hague Central Authority at the above address, who in turn shall forward a copy of the same to Berge at Calle Alcalá 65, E-28014 Madrid, Spain in accordance with the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, and the laws of the Kingdom of Spain.

### SUMMARY OF CASE

9. This case stems from the transportation of cargo, a tamping unit and stabilizer, by SPL for Berge, Berge's misdescription of the cargo and resulting increase in of freight and associated costs of the transportation thereof, and Berge's failure to pay the increased costs despite both a promise to pay and confirmation of payment by wire transfer, which payment was cancelled by Berge immediately after SPL delivered the cargo to its destination.

### FACTS

10. <u>October 17, 2015</u>

Berge provided SPL the dimensions and weights of the cargo, post of arrival and final destination. Based upon Berge's dimensions and weights and routing, SPL quoted Berge a cost of $88,000.00, which included third party costs of $80,000.00 and a gross profit of $8,000.00 for SPL. Based upon Berge's dimensions and weights, the stabilizer unit was originally quoted and permitted at 146 inches (the actual height was 153 inches – see below). Based upon Berge's dimensions and weights, the tamping unit was quoted and permitted at

144 inches (the the actual height was 149 inches see below).  The weights provided by Berge on both machines were also incorrect requiring different trailer configurations than those included in SPL's aforementioned quoted cost of transportation.

11. <u>October 28, 2015</u>

SPL requested Berge to confirm the dimensions and weights of the cargo. Berge again confirmed the dimensions and weights. SPL had Buchanan, the trucking company ultimately hired to transport the cargo, request required permitting based on those dimensions and weights.

12. <u>November 9, 2015</u>

SPL informed Berge that the state permits were ordered and in place.

13. <u>November 10, 2015</u>

Berge sent a PO to SPL requesting SPL execute the same. This PO also showed the dimensions and weights as originally provided and now permitted. SPL did not sign the PO.

14. <u>November 16, 2015</u>

Buchanan was at the Port of Baltimore ready for direct discharge of the cargo onto its trucks as planned by SPL.  Berge had their representative, David Cerrato, at the Port of Baltimore to witness the discharge.

Buchanan advised SPL the dimensions provided by Berge were inaccurate: (a) the actual measurement of the stabilizer was 153 inches high, not 146.85 inches and (b) the actual size of the tamping was 149 inches, not 144.09 inches..

Buchanan advised SPL the weights provided by Berge were inaccurate: (a) the actual weight of the stabilizer was above 134,000 pounds, not 126,765.8 pounds, same discrepancy for the tamping unit.

Given the above actual dimensions and weights of the cargo, SPL was unable to transport either piece per the approved permits and original plan. SPL was required to evaluate the best way to proceed as the trailer carrying the stabilizer could not be utilized given its axle configuration and transportation of the cargo would require obtaining new permitting.

SPL advised Berge that the equipment scheduled to carry the tamping unit did not have enough axles and it would be necessary to reapply for permits due to both the increased height and weight.

SPL advised Berge that the equipment scheduled to carry the stabilizer had the same issues in terms of limitations and requirement for new permitting and equipment as the tamping unit and it would be necessary to reapply for permits due to both the increased height and weight.

SPL also advised Berge that SPL was currently looking for replacement trailers to haul the cargo and that SPL would advise Berge as soon as SPL had a viable option in place.

15. November 17, 2015

Buchanan provided information to SPL and Berge regarding the permits. Buchanan stated, "MD-PA and NY all take 10 business days—which next week being a holiday- the state will be closed NOV 26th and 27th.   Once permits are issued it takes 48 hours to set up police and monitors for structures.   A realistic move date would be 12/3- 12/6. Another issues is if we cannot get the height down then we have to get all new height surveys, from pickup in Baltimore, MD to Ottawa, ON jobsite at 15'5" high—this will take a minimum of 3 days just to have a service run the surveys before I can start on the permits. Basically we are starting over again—We cannot reference any of the old permits"

Berge requested SPL "explore" other options, implying that SPL move the cargo without proper permits, illegally in the Unites States and Canada. Specifically, Berge stated, "Isn't

there any alternative way to expedite the transport? I mean we are not talking about huge loads, it's clear that there are some differences but you know as well as me that many times truckers are driving above weights and dims on the permits, and chances to be weighted and measured on the road are minimal. Please explore any alternative that could speed up the process."

16. November 18, 2015

Berge instructed SPL to load and deliver the cargo.

17. November 30, 2015

SPL provided Berge with the amount of additional costs for the transportation of the cargo, passing on the costs as NET charges to Berge. These additional costs were still budgetary - not all invoices have been received from third parties (i.e. escorts, permits, etc.) and a definite transportation plan was not yet in place.

18. December 7, 2015

Regarding the additional costs as per Buchanan's V.P., Richard Miller, "Everything but the tamping unit and stabilizer are up to date - I cannot update the last two until the one is delivered and the stabilizer plan is finalized with permitting." SPL passed this same information to Berge that Richard Miller advised and followed up on the additional costs with Berge requesting from Berge: "Have you passed this onto your customer for approval yet? We don't want to get into any delays with carrier regarding payments etc."

19. December 8, 2015

Berge advised SPL that it was analyzing all the information.

20. December 14, 2015

SPL sent another email to Berge on the additional costs as Buchanan wants confirmation on the loads that were delivered.  SPL again in good faith is holding to SPL's original amount quoted of only $8,000.00 gross profit on this file.

SPL advised Berge that stabilizer needed to be reduced in height.  Specifically, SPL stated, "It seems that reducing the height of the Stabilizer is the only viable option.  But without knowing how much they can reduce, a route study will be difficult.  In order to use the same route as we did for the tamper, they would need to reduce the stabilizer a full 8".  I am sure Buchanan can start the permit process early but they would need to know actually what height the stabilizer will load out at."

21. December 15, 2015

Berge accepted the charges and requested more documentation regarding standby and permitting. SPL provided this information to Berge.

22. December 28, 2015

SPL provided Berge updated, approximate additional costs for the transportation of the cargo.  These costs were still budgetary as the final costs are not yet known.

23. January 4, 2016

SPL still has not received confirmation from Berge of its acceptance of the additional costs that were provided to Berge on 11-30-15 and then resent with updated costs on 12-28-15.

24. January 5, 2016

Berge failed to reply on the additional costs; however, Berge requested a date on delivery.   SPL provided Berge an updated delivery schedule.

25. <u>January 7, 2016</u>

SPL again followed up with Berge on the additional costs. Berge failed to respond.

26. <u>January 11, 2016</u>

SPL sent the backup paperwork for the permitting per Berge's request.

27. <u>January 13. 2016</u>

SPL informed Berge transit of other cargo that was stopped due to weather conditions. This email stated, "Buchanan will hold truck at the US crossing until agreement on additional charges is confirmed. Please see attached spread sheet showing all project charges to date and estimated additional charges for this last load. These are NET/NET charges to us with NO profit for SPL reflected."

28. <u>January 15, 2016</u>

Berge again asked for more documentation. Specifically, Berge wrote "Since our telcon yesterday, up to now, unless we are mistaken, we´ve not received any documents, evidences neither comments from your side. Please let us remind you one more time that we do not want to go away from our responsibilities and we are ready to assume the extra cost, but always duly justified, against the relevant documents. Regarding the transport execution of the stabilizer, respectfully, this is something that has to be well managed by you, it´s SPL the one who has the relation with BUCHANAN. In that respect, and going deeper into BPC clear intention to assume its responsibility (indeed and as a prove of it, we have already confirmed in written some extra costs), please be advised that the truck cannot be held at the US crossing/nowhere else because the additional charges have not been confirmed, as we repeat we want to pay those charges but only against the corresponding evidences."

29. January 19, 2016

SPL provided updated information to Berge on the permit applications. Specifically, SPL stated, "Assuming the CG [center of gravity] was centered. But when the car was place on the trailer, it was clear that the CG was off, making the back axel weight heavier. The PA inspector made the call about re-applying. It was his discretion. But once he made that requirement, the state engineer dept had do a new bridge study."

30. January 20, 2016

Berge provides an email stating what Berge agrees to paying. This does NOT even include SPL profit share of $8,000.00. SPL has provided many updates, teleconferences, phone calls, services of work, and Berge is not agreeing to pay the profit share we agreed on or the additional costs for the stabilizer, profiling, tamping unit. This was not accepted by SPL.

31. January 26, 2016

SPL again sent invoices to Berge with backup.

32. January 28, 2016

SPL again follows up with Berge on the additional charges.

33. February 1, 2016

SPL provided clarification on the invoices again with backup documentation from third parties. Berge responded that all the additional costs are for the SPL and Buchanan relationship. The stabilizer unit was still on hold at this point.

34. February 2, 2016

Berge again sends an email advising SPL that Berge was not accepting additional costs.

35. <u>February 3, 2016</u>

SPL sent an email to Berge again providing information on the dimension and weight discrepancies and also [provided updated invoices. SPL advised Berge that that SPL needed 100% of the charges to be deposited into SPL's bank account via wire transfer.   SPL attached both invoices for the transportation of the cargo.   SPL advised Berge, "SPL is passing these costs as a pass thru cost to you which we believe is fair. The total amount due was for SPLINV-198 $107,854.42 and SPLINV203 $87,264.21. SPL also advised Berge, "Both Buchanan and SPL are not marking up the additional costs, however any other fees associated with any delays due to Berge not paying the invoices, for delaying for delivery of cargo, storage, or any other associated costs will be billed at cost +20% plus any legal fees (if applicable)."

SPL and Berge conducted a conference call during which Berge agreed to pay 50% in advance and then 50% before cargo would be released released. This conference call was confirmed in an e-mail to Berge wherein SPL stated, "Berge, As per our phone conversation pls send wire receipt for 50% of both invoices today.  The remaining 50% will be paid on delivery of cargo at site.  We will have trailer onsite with customer however remaining 50% will need to be paid before cargo is offloaded from trailer.  We will inform you the day prior of delivery so you can make arrangements for no delays on the wire being received."

Berge provided an email to SPL agreeing to the amounts that had been invoiced by SPL. Specifically, Berge stated, "We will transfer the 50% amount due today and the remaining 50% upon discharging the cargo. As of today we do not have any guaranty that your subcontractor will fulfill their task. You will agree with me that during the last few weeks they have been providing confusing information and at this point the situation is far from

clear. We are working together with our legal counselor in Michigan to take the actions needed in case the cargo is hold or other excuses arise (police, escorts, permits......) The agreement between Berge and SPL is clear and so far we have not broken any commitment. We do not discuss the differences in the dimensions and the consequences, but we will not accept extortion as a way for solving the situation. Let's work on a constructive way of solving this matter as soon as possible and have this unit delivered."

SPL resent invoices to Berge to process for payment. Berge advised SPL that the banks were closed and that the wire would be sent the following morning.

SPL again provided Berge an update on the stabilizer. Specifically, SPL advised Berge, "Truck is still at PA/ NY line waiting for inspection and police escorts tomorrow at 7am. The plan is to make it as far as Pavillion, NY by tomorrow evening. Friday they will travel on to the ONT line and layover for the weekend. Monday, Ontario Police are set to roll at 7am. ETA into Ottawa is currently Tues, 2/9, mid-morning."

36. February 4, 2016

The truck permits were received and the trucks began transporting the cargo to its destination.

Berge sent the first wire receipt ($97,559.32) and again agreed that both invoices would be paid.

SPL provided a status update to Berge. Specifically, SPL advised, "I spoke with Via Canada this morning and they already have the crane ordered for the Tuesday offload. They will be sending an email shortly to let us know when the truck needs to mobilized into site, after crane is set up. So all indications are that it will be a smooth delivery and offload sometime late evening on Tuesday. With that in mind, and as per our discussions with your group,

we'd like to see a wire receipt for the remaining 50% by COB on Monday or at the latest, open of business your time on Tues so we have it when we get into the office and the truck is on-site for delivery. It seems as though it took a couple of days to get the first 50% executed, so we wouldn't want any delays next week that would push us past Via Canada's small window of opportunity get us in there to offload."

37. February 5, 2016

SPL advised Berge that the truck was still on schedule to deliver the cargo to its destination on Tuesday. SPL again sends Berge a reminder regarding payment. Specifically, SPL reminds Berge, "Please also confirm receipt of below message regarding the remaining 50% for the invoices. Please confirm that we will be getting a wire receipt by COB Monday, to avoid delays at offloading."

38. February 6, 2016

Berge provided an email to SPL wherein it is stated, "Good morning Alan, The wire will be made once the trucks reach the job site. All is ready on our side but we do not want any more delays or surprises. Let's update on Monday and act accordingly."

39. February 8, 2016

Berge provided an email to SPL wherein it is stated, "Good afternoon Richard and thanks for the update. Second transfer will be done at our opening tomorrow (Tuesday) so you will have a copy of the wire before you get to the office."

40. February 9, 2016

Berge provided SPL the second wire transfer receipt. SPL timely delivered the stabilizer to be offloaded.

41. <u>February 17, 2016</u>

After the cargo was offloaded, Berge requested a conference call. During the conference call, Berge advised SPL that it had cancelled the wire transfer.

## CONDITIONS PRECEDENT

42. All conditions precedent to SPL bringing the following causes of action have occurred.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

43. SPL incorporates the above paragraphs 10 through 42 is if fully set forth herein.

44. (a)    There was a valid and enforceable contract between SPL and Berge;

(b)    SPL is the proper party to bring this cause of action;

( c )    SPL performed its contractual obligations;

(d)    Berge breached this contract; and

( e )    Berge's breach of this contract caused SPL injury.

## SECOND CAUSE OF ACTION – QUANTUM MERUIT

45. SPL incorporates the above paragraphs 10 through 42 is if fully set forth herein.

46. (a)    SPL provided valuable services to Berge

(b)    Berge accepted the services of SPL; and

( c )    Berge had reasonable notice SPL expected compensation for the services.

## THIRD CAUSE OF ACTION 3 – FRAUD

47. SPL incorporates the above paragraphs 10 through 42 is if fully set forth herein.

48. (a)    Berge made representations to SPL:

(i)    representations regarding the dimensions and weight of the cargo; and

        (ii)     representations regarding agreement to pay and actual payment for services.

(b)     These representations were false;

( c )     When Berge made these representations, Berge

        (i)     knew the representations were false, or

        (ii)     made the representations recklessly, as positive assertions, and without knowledge of the truth;

(d)     Berge made these representations with the intent that SPL act on them;

( e )     SPL relied upon these representations; and

(f)     These representations caused SPL injury.

## DAMAGES

49. SPL seeks the following damages:

### Breach of Contract and Quantum Meruit

Actual damages in the amount of $102,359.31, contractually owed associated "costs plus" in the amount of $20,471.86 (total actual damages $122,831.17), attorney's fees as set forth below, pre and post judgment interest, and costs of court.

### Fraud

Actual damages in the amount of $102,359.31, contractually owed associated "costs plus" in the amount of $20,471.86 (total actual damages $122,831.17), exemplary damages as set forth below, pre and post judgment interest, and costs of court.

14

## ATTORNEY'S FEES

50. Pursuant to the Texas Civil Practice and Remedies Code, Chapter 38, Section 38.001, SPL may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:

> (1) rendered services;
>
> (4) freight or express overcharges; or
>
> (8) an oral or written contract.

SPL brings this cause for reasonable and necessary attorney's fees, the amount of which cannot be determined at this time

## EXMPLARY DAMAGES

50. Pursuant to the Texas Civil Practice and Remedies Code, Chapter 41, Section 41.003(a)(1), SPL may recover exemplary damages upon this Court's finding of Berge's fraud by clear and convincing evidence. SPL brings this cause for exemplary damages, the amount of which shall be determined by this Court after a trial on the merits.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Specialized Power Logistics, LLC (SPL), respectfully prays that, after a trial on the merits, this Court enter judgment in favor of SPL and against Berge Project Cargo, S.L. (BPC) and Berge Shipping (BS), (collectively Berge), on the aforementioned causes of action, and award SPL actual damages in the amount of $122,831.17, reasonable and necessary attorney's fees, exemplary damages, pre and post judgment interest at the maximum rate allowed by law, costs of court, and such other and further relief at law and in equity to which SPL is justly entitled.

Respectfully submitted,

*Edwin K. Nelson, IV*

Texas State Bar No.: 14890600
3814 Sun Valley Drive
Houston, Texas 77025
Telephone: (713) 668-5100
Facsimile: (713) 668-5110
E-Mail: seaproctor@hotmail.com

COUNSEL OF RECORD FOR PLAINTIFF
SPECIALIZED POWER LOGISTICS, LLC

EN EL TRIBUNAL FEDERAL DE DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO MERIDIONAL DE TEXAS
HOUSTON, DIVISIÓN

| | | |
|---|---|---|
| SPECIALIZED POWER LOGISTICS LLC, | § § § | |
| Parte demandante, | § § | |
| vs. | § § | CAUSA n.º: _____ |
| BERGE PROJECT CARGO, S.L., y BERGE SHIPPING, | § § § | (Civil) |
| Partes Demandadas. | § § | |

## **DENUNCIA ORIGINAL DE LA PARTE DEMANDANTE**

ANTE LA PRESENCIA DE LOS ILUSTRÍSIMOS SEÑORES DE DICHO TRIBUNAL:

COMPARECE EN ESTE ACTO, la Parte demandante, Specialized Power Logistics, LLC (SPL), presentando una demanda contra la Parte demandada, Berge Project Cargo, S.L. (BPC) y Berge Shipping (BS), (colectivamente Berge), y por debida causa respetuosamente querría mostrar al Tribunal lo siguiente:

## **PARTES**

1. Specialized Power Logistics, LLC, (SPL), es una sociedad de responsabilidad limitada, constituida y existente de conformidad con las leyes del estado de Texas. SPL tiene una oficina principal ubicada en 440 Benmar Drive, Suite 3040, Houston, Texas.

2. Berge Project Cargo, S.L. (BPC) es una entidad empresarial extranjera constituida y existente de conformidad con las leyes del Reino de España. Berge Shipping (BS) es una filial, subsidiaria o nombre comercial bajo el que opera BPC. BPC y BS tienen una oficina principal ubicada en Calle Alcalá 65, E-28014 Madrid, España.

1

3.  BPC y BS serán denominadas en lo sucesivo colectivamente Berge.

## JURISDICCIÓN Y COMPETENCIA

4.  Este Tribunal es competente en esta causa en virtud del título 28 del USC (United States Code [Código de los Estados Unidos]) § 1332, ya que las partes no comparten la misma ciudadanía y el importe en litigio supera los SETENTA Y CINCO MIL DÓLARES (75,000.00 $) y NINGÚN CENTAVO.

Este Tribunal es la jurisdicción apropiada en virtud del título 28 del USC 1391 §§ (a) y (b)(2) ya que una parte sustancial de los actos u omisiones que dieron lugar a la demanda tuvieron lugar en Houston, Texas

## NOTIFICACIÓN DEL PROCEDIMIENTO

5.  El Reino de España ratificó el Convenio de 15 de noviembre de 1965 sobre la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en Materia Civil o Comercial, también denominado el Convenio de La Haya sobre Notificación, el 4 de junio de 1987, y sus disposiciones entraron en vigor el 3 de agosto del mismo año.

6.  Los Estados Unidos de América ratificaron el Convenio de 15 de noviembre de 1965 sobre la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en Materia Civil o Comercial en 1969.

7.  Con arreglo al derecho de los Estados Unidos, los abogados que representan a las partes en los tribunales en los Estados Unidos son autoridades competentes para la elaboración y presentación de solicitudes de notificación o traslado destinadas a las Autoridades centrales extranjeras. Véase la Regla 4 de las Reglas Federales de Procedimiento Civil (FRCP, Federal Rules of Civil Procedure); *Holloway vs. Arkansas*, 435 U.S. 475 (1978); véase también *Charleston Aluminum, LLC vs. Ulbrinox S. De R.L. de S.V.*, n.º 3:12–2389–

MBS, 2013 WL 152895 (D.S.C. 15 ene. 2013); *Coombs vs. Iorio*, n.º CIV-06-060-SPS, 2008 WL 4104529 (E.D. Okla. 28 ago. 2008); *Marschauser vs. Travelers Indemnity Co.*, 145 F.R.D. 605, 607 (S.D. Fla.1992).

8.  La Autoridad central de La Haya de España es:

> Subdirección General de Cooperación Jurídica Internacional
> Ministerio de Justicia
> c/ San Bernardo N° 62
> 28071 MADRID
> España

En consecuencia, Berge puede recibir la notificación del procedimiento mediante la expedición, mediante correo certificado con acuse de recibo, de una copia y copia certificada traducida de la demanda original de la Parte demandante y de la Citación a la Autoridad Central de La Haya de España a la dirección anterior, quien a su vez remitirá una copia de la misma a Berge, a la Calle Alcalá 65, E-28014 Madrid, España, de acuerdo con el Convenio de 15 de noviembre de 1965 sobre la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en Materia Civil o Comercial , y el derecho del Reino de España.

## DETALLES DEL CASO

9.  Este caso se deriva del transporte de la carga, un dispositivo apisonador y estabilizador, por parte de SPL y por encargo de Berge, la descripción errónea de Berge de la carga y el incremento resultante de la carga y los costes asociados de su transporte, y el impago por parte de Berge del aumento de costes a pesar tanto de una promesa de pago como de la confirmación del pago por transferencia bancaria, pago que fue anulado por Berge inmediatamente después de que SPL hubiese hecho entrega de la carga en su destino.

**HECHOS**

10. 17 de octubre de 2015

Berge proporcionó a SPL las dimensiones y el peso de la carga, puesto de llegada y destino final. En base a las dimensiones y peso, y elección de rutas de Berge, SPL le dio a Berge un presupuesto por un coste de 88,000.00 dólares, el cual incluye costes de terceros por importe de 80,000.00 dólares y un beneficio bruto de 8,000.00 dólares para SPL. En base a las dimensiones y peso de Berge, en un principio se proporcionó el presupuesto para el dispositivo estabilizador en base a un máximo de 146 pulgadas (la altura real fue de hecho 153 pulgadas – véase más adelante). En base a las dimensiones y peso de Berge, se proporcionó el presupuesto para el dispositivo apisonador en base a un máximo de 144 pulgadas (la altura real fue de hecho 149 pulgadas [–] véase más adelante). Los pesos proporcionados por Berge para ambas máquinas también eran incorrectos y requirieron diferentes configuraciones de remolque que los incluidos en el presupuesto por el transporte proporcionado antes mencionado de SPL.

11. 28 de octubre de 2015

SPL solicitó a Berge que confirmase las dimensiones y el peso de la carga. Berge confirmó una vez más las dimensiones y el peso. SPL hizo que Buchanan, la empresa de transporte contratada en última instancia para transportar la carga, solicitase los permisos exigidos en base a esas dimensiones y peso.

12. 9 de noviembre de 2015

SPL informó a Berge que los permisos estatales habían sido solicitados y estaban en orden.

IV

13. <u>10 de noviembre de 2015</u>

Berge envió una PO (Purchase Order [Pedido de Compra]) para solicitar SPL que ejecutase la misma. Este PO también mostró las dimensiones y el peso tal y como se proporcionaron en un principio y se autorizaron en ese entonces. SPL no firmó el PO.

14. <u>16 de noviembre de 2015</u>

Buchanan estaba en el Puerto de Baltimore listo para la descarga directa de la carga en sus camiones tal y como estaba previsto por SPL. Berge contaba con su representante, David Cerrato, en el Puerto de Baltimore para presenciar la descarga.

Buchanan advirtió a SPL que las dimensiones proporcionadas por Berge eran inexactas: (a) la medida real del estabilizador era de 153 pulgadas de altura, no 146,85 pulgadas y (b) el tamaño real del [dispositivo] apisonador era 149 pulgadas, no 144.09 pulgadas.

Buchanan advirtió a SPL que el peso proporcionado por Berge era inexacto: (a) el peso real del estabilizador superaba las 134.000 libras, y no se correspondía con las 126.765.,8 libras proporcionadas, apreciándose la misma discrepancia para el dispositivo apisonador.

Dadas las dimensiones y el peso reales anteriores de la carga, SPL fue incapaz de transportar cualquiera de los dos dispositivos de acuerdo con los permisos aprobados y el plan original. Se le requirió a SPL que evaluase la mejor manera de proceder ya que el remolque que llevaba el estabilizador no podría ser utilizado debido a su configuración de ejes y que el transporte de la carga requeriría la obtención de nuevos permisos.

SPL advirtió a Berge que el equipo previsto para llevar el dispositivo apisonador no tenía suficientes ejes y sería necesario solicitar permisos de nuevo debido tanto al incremento de la altura como del peso.

v

SPL advirtió a Berge que el equipo previsto para llevar el estabilizador tenía los mismos problemas por lo que respecta a las limitaciones y la necesidad de nuevos permisos y equipos que el dispositivo apisonador y sería necesario volver a solicitar los permisos debidos tanto al incremento de la altura como del peso.

SPL también advirtió a Berge SPL que estaba buscando en ese momento remolques de recambio para transportar la carga y que SPL advertiría a Berge tan pronto como SPL contase con una opción viable definitiva.

15. <u>17 de noviembre de 2015</u>

Buchanan proporcionó información a SPL y Berge con respecto a los permisos. Buchanan indicó, "MD-PA y NY tardan 10 días hábiles — dado que hay festivos la próxima semana — el estado se encontrará cerrado el 26 y el 27 de nov. Una vez que se hayan obtenido los permisos se necesitan 48 horas para realizar los trámites oportunos con la policía y los monitores para las estructuras. Una fecha de traslado realista sería del 3/12 - 6/12. Otra cuestión es si no podemos reducir la altura en cuyo caso tenemos que obtener de nuevo todos los peritajes de altura, desde la recogida en Baltimore, MD hasta Ottawa, ON en el lugar de las obras a 15'5" de altura — lo que llevaría un mínimo de 3 días solo para que el departamento llevase a cabo los peritajes antes de que pueda comenzar con los permisos. Básicamente supone empezar de nuevo — No podemos hacer referencia a ninguno de los antiguos permisos"

Berge solicitó a SPL que "explorase" otras opciones, insinuando que SPL trasladase la carga sin los permisos apropiados, de manera ilegal en los Estados Unidos y Canadá. En concreto, Berge indicó: "¿No hay ninguna manera alternativa de agilizar el transporte? Me refiero a que no estamos hablando de cargas enormes, está claro que hay algunas diferencias, pero

VI

sabe tan bien como yo que muchas veces los camioneros conducen con pesos y dimensiones que superan los permisos, y las probabilidades de que se pesen y midan en la carretera son mínimas. Por favor, explore cualquier alternativa que pudiese acelerar el proceso".

16.  <u>18 de noviembre de 2015</u>

Berge instruyó a SPL a que cargase y entregase la carga.

17.  <u>30 de noviembre de 2015</u>

SPL proporcionó a Berge el importe de los costes adicionales por el transporte de la carga, repercutiendo los costes como gastos NETOS a Berge. Estos costes adicionales estaban todavía basados en un presupuesto — todavía no se habían recibido todas las facturas de terceros (es decir, escoltas, permisos, etc.) y todavía no estaba disponible un plan de transporte definitivo.

18.  <u>7 de diciembre de 2015</u>

En cuanto a los costes adicionales como por ejemplo el VP de Buchanan, Richard Miller [indicó], "Todo menos el dispositivo apisonador y el estabilizador están al día - No puedo actualizar los dos últimos hasta que se entregue uno y el plan del estabilizador esté concluido con los permisos". SPL pasó esta misma información a Berge a la que Richard Miller advirtió de los costes adicionales y volvió a ponerse en contacto con Berge para pedir a Berge: "¿Aún no ha pasado esto a su cliente para su aprobación? No queremos vernos implicados en cualquier demora con la compañía de transportes en relación a los pagos, etc".

19.  <u>8 de diciembre de 2015</u>

Berge advirtió a SPL que estaba analizando toda la información.

20. <u>14 de diciembre de 2015</u>

SPL envió otro correo electrónico a Berge con los costes adicionales ya que Buchanan quería la confirmación de las cargas que se entregaron. SPL de nuevo de buena fe mantiene el importe original del presupuesto proporcionado de SPL de solo 8.000,00 dólares de beneficio bruto en este dossier.

SPL advirtió a que Berge que era necesario reducir la altura del estabilizador. En concreto, SPL indicó: "Parece ser que la reducción de la altura del estabilizador es la única opción viable. Pero sin saber cuánto pueden reducir, el estudio del recorrido será difícil. Para usar la misma ruta que usamos para la apisonadora indebida, tendrían que reducir el estabilizador un total de 8". Estoy seguro de Buchanan podría iniciar el proceso de permisos antes, pero tendrían que saber la altura real del estabilizador a cargar".

21. <u>15 de diciembre de 2015</u>

Berge aceptó los cargos y solicitó más información con respecto al tiempo de espera y los permisos. SPL proporcionó a Berge esta información.

22. <u>28 de diciembre de 2015</u>

SPL proporcionó a Berge, los costes adicionales aproximados actualizados para el transporte de la carga. Estos costes seguían estando basados en un presupuesto ya que los costes finales aún no se conocían.

23. <u>4 de enero de 2016</u>

SPL todavía no ha recibido la confirmación de Berge de su aceptación de los costes adicionales que se proporcionaron a Berge el 30/11/2015 y se le enviaron después con los costes actualizados el 28/12/2015.

24. 5 de enero de 2016

Berge no respondió a los costes adicionales; sin embargo, Berge solicitó una fecha de entrega. SPL proporcionó a Berge un calendario actualizado de entrega.

25. 7 de enero de 2016

SPL volvió a ponerse en contacto con Berge en relación con los costes adicionales. Berge no respondió.

26. 11 de enero de 2016

SPL envió la documentación de respaldo para los permisos a solicitud de Berge.

27. 13 de enero de 2016

SPL informó a Berge del tránsito de otra carga que se vio impedido debido a las condiciones meteorológicas. Este correo electrónico indicó, "Buchanan retendrá el camión en el paso fronterizo de EE.UU. hasta que se confirme un acuerdo sobre los cargos adicionales. Por favor, vea la hoja de cálculo adjunta que muestra todos los cargos del proyecto hasta la fecha y los cargos adicionales estimados para esta última carga. Estos son NETOS/cargos NETOS para nosotros SIN repercutir ningún beneficio para SPL".

28. 15 de enero de 2016

Berge volvió a pedir más documentación. En concreto, Berge informó por escrito de lo siguiente "Desde nuestra telcon [teleconferencia] ayer, hasta ahora, a menos que estemos equivocados, no hemos recibido ningún documento, pruebas [sic] ni comentarios de su parte. Nos permitimos recordarles una vez más que no queremos eludir nuestras responsabilidades y estamos dispuestos a asumir el coste adicional, pero siempre debidamente justificado, cotejado con los documentos pertinentes. En cuanto a la

realización del transporte del estabilizador, con el debido respeto, es algo que tiene que ser bien gestionado por usted, es SPL la que mantiene la relación con BUCHANAN. En ese sentido, y profundizando en la clara intención de BPC de asumir su responsabilidad (de hecho, y como prueba de ello, ya hemos confirmado por escrito algunos costes adicionales), tenga en cuenta que el camión no se puede mantener en el paso fronterizo de EE.UU./o cualquier otro sitio porque los cargos adicionales no hayan sido confirmados, como repetimos queremos pagar esos cargos, pero solo cotejados con las correspondientes pruebas [sic]".

29. <u>19 de enero de 2016</u>

SPL proporcionó a Berge información actualizada de las solicitudes de permisos. En concreto, SPL indicó: "Suponiendo que el CG [centro de gravedad] se centrase. Pero cuando se colocó el dúmper al remolque, era evidente que el CG estaba descentrado, por lo que el peso sobre el eje trasero era mayor. El inspector de PA tomó la decisión de presentar de nuevo la solicitud. Fue su criterio. Pero una vez que planteó ese requisito, el departamento de ingeniería del estado tenía que hacer un nuevo estudio puente ".

30. <u>20 de enero de 2016</u>

Berge proporciona un correo electrónico indicando lo que Berge acuerda pagar, lo que NI siquiera incluye la participación de los beneficios de SPL de 8,000.00 dólares. SPL ha proporcionado muchas veces información actualizada, teleconferencias [y] llamadas telefónicas [y] ha prestado servicios, y Berge no acepta pagar la participación de los beneficios que acordamos o los costes adicionales para el estabilizador, la elaboración de perfiles [o] el dispositivo apisonador, lo que no fue aceptado por SPL.

X

31. <u>26 de enero de 2016</u>

SPL volvió a enviar facturas a Berge con el respaldo.

32. <u>28 de enero de 2016</u>

SPL se vuelve a poner en contacto con Berge en relación con los cargos adicionales.

33. <u>1 de febrero de 2016</u>

SPL proporcionó aclaraciones sobre las facturas de nuevo con la documentación de respaldo de terceros. Berge respondió que todos los costes adicionales eran relativos a la relación entre SPL y Buchanan. El dispositivo estabilizador todavía estaba retenido en este punto.

34. <u>2 de febrero de 2016</u>

Berge de nuevo envía un correo electrónico advirtiendo a SPL que Berge no aceptaba costes adicionales.

35. <u>3 de febrero de 2016</u>

SPL envió un correo electrónico a Berge de nuevo proporcionando información sobre las discrepancias de dimensiones y peso, y también facilitando facturas actualizadas. SPL advirtió a Berge que SPL necesitaba que se depositasen el 100% de los cargos en la cuenta bancaria de SPL a través de una transferencia bancaria. SPL adjuntó ambas facturas por el transporte de la carga. SPL advirtió a Berge, "SPL le está repercutiendo estos costes como un coste a ser repercutido que creemos que es justo. El importe total a pagar por SPLINV-198 era de 107,854.42 dólares y por SPLINV203 de 87,264.21 dólares. SPL también advirtió a Berge, "Ni Buchanan ni SPL están repercutiendo un margen de beneficios a los costes adicionales, sin embargo otros cargos asociados a las demoras debidas a que Berge no pague las facturas, por la demora en la entrega de la carga, almacenamiento, o cualquier otro gasto asociado serán facturados al coste + 20%, además de los gastos legales (en su caso)".

SPL y Berge mantuvieron una teleconferencia durante la cual Berge acordó pagar el 50% por adelantado y a continuación el 50% antes de la entrega de la carga [sic]. Esta teleconferencia se confirmó en un correo electrónico a Berge en que SPL indicó: "Berge, según lo acordado por teléfono le rogamos envíe recibo de la transferencia bancaria del 50% por ambas facturas hoy. El 50% restante se pagará a la entrega de la carga en la obra. Tendremos el remolque en la obra del cliente, sin embargo el 50% restante tendrá que ser pagado antes de que se descargue la carga del remolque. Le informaremos el día antes de la entrega para que pueda tomar las medidas oportunas para que no se produzca ningún retraso a la hora de recibir la transferencia bancaria".

Berge proporcionó un correo electrónico a SPL aceptando los importes que habían sido facturados por SPL. En concreto, Berge indicó, "Transferiremos el 50% del importe a pagar hoy y el 50% restante a la descarga de la carga. Al día de hoy no tenemos ninguna garantía de que su subcontratista cumplirá con su tarea. Estará de acuerdo conmigo en que durante las últimas semanas han estado proporcionando información confusa y en este momento la situación está lejos de estar clara. Estamos trabajando con nuestro asesor legal en Michigan para tomar las acciones necesarias en el supuesto de que la carga sea retenida o surjan otras excusas (policía, escoltas, permisos......) El acuerdo entre Berge y SPL está claro y hasta el momento no se ha roto ningún compromiso. No discutimos las diferencias en las dimensiones y las consecuencias, pero no aceptaremos la extorsión como una manera de resolver la situación. Trabajemos juntos para obtener un modo constructivo de solucionar este asunto tan pronto como sea posible y hacer que se entregue este dispositivo".

SPL envió de nuevo las facturas a Berge para procesar el pago. Berge advirtió SPL que los bancos estaban cerrados y que la se enviaría la transferencia a la mañana siguiente.

SPL proporciona de nuevo a Berge información actualizada sobre el estabilizador. En concreto, SPL advirtió a Berge, "El camión todavía se encuentra en la frontera estatal entre PA y NY a la espera de la inspección y de la escolta policial mañana a las 7 de la mañana. El plan es llegar hasta Pavillion, NY mañana por la tarde. El viernes seguirán hasta la frontera de ONT y la parada del fin de semana. El lunes está previsto que la policía de Ontario esté lista a las 7 de la mañana. La ETA (estimated time of arrival [hora prevista de llegada]) a Ottawa es en la actualidad el mar, 9/2, a media mañana".

36. 4 de febrero de 2016

Se recibieron los permisos para los camiones y los camiones comenzaron a transportar la carga a su destino.

Berge envió el primer recibo de la transferencia bancaria (97,559.32 $) y de nuevo aceptó que se pagarían las dos facturas.

SPL proporcionó información actualizada a Berge. En concreto, SPL advirtió, "Hablé con Via Canada esta mañana y ya tienen la grúa pedida para la descarga del martes. Van a enviar un correo electrónico en breve para hacernos saber cuándo se tiene que desplazar el camión a la obra, después de que se haya instalado la grúa. Así que todo apunta a que se realizará la entrega y descarga sin problemas en algún momento a última hora de la tarde del martes. Con esto en mente, y según nuestras conversaciones con su grupo, nos gustaría ver un recibo de la transferencia bancaria por el 50% restante al COB (close of business [cierre de las operaciones del día]) el lunes o, a más tardar, a la apertura de las operaciones del día según su uso horario el mar[tes] para que lo tengamos cuando lleguemos a la oficina y el camión esté en la obra para la entrega. Si tal y como parece se tardó un par de días en conseguir la transferencia del primer 50%, nos gustaría evitar cualquier demora la próxima

semana que nos haría perder la estrecha ventana de oportunidad de Via Canada para descargar".

37.  5 de febrero de 2016

SPL advirtió a Berge que el camión seguía con arreglo al calendario previsto para entregar la carga a su destino el martes. SPL envía de nuevo a Berge un recordatorio con respecto al pago. En concreto, SPL recuerda a Berge, "Por favor, confirme también la recepción del mensaje a continuación en relación con el 50% restante de las facturas. Por favor, confirmen que vamos a recibir un recibo de la transferencia bancaria al COB el lunes, para evitar demoras en la descarga".

38.  6 de febrero de 2016

Berge proporcionó un correo electrónico a SPL en el que se afirmaba: "Buenos días, Alan, se realizará la transferencia bancaria una vez que los camiones lleguen a la obra. Todo está listo de nuestra parte, pero no queremos ninguna demora más o sorpresas. Actualicemos la información el lunes y actuemos en consecuencia".

39.  8 de febrero de 2016

Berge proporcionó un correo electrónico a SPL en el que se afirmaba: "Buenas tardes Richard y gracias por la información actualizada. La segunda transferencia se llevará a cabo cuando abramos mañana (martes) por lo que tendrá una copia de la transferencia bancaria antes de llegar a la oficina".

40.  9 de febrero de 2016

Berge proporcionó a SPL el recibo de la segunda transferencia bancaria. SPL entregó a tiempo el estabilizador para ser descargado.

41. <u>17 de febrero de 2016</u>

Después de que la carga fuese descargada, Berge solicitó una teleconferencia. Durante la teleconferencia, Berge advirtió a SPL que había cancelado la transferencia bancaria.

## CONDICIÓN PREVIA

42. Se han producido todas las condiciones previas para que SPL inicia acciones penales.

## PRIMERA CAUSA DE ACCIÓN – INCUMPLIMIENTO DE CONTRATO

43. SPL incorpora los párrafos anteriores 10 a 42 es si se hubiesen incorporado a la presente íntegramente.

44. (a)     Había un contrato válido entre SPL y Berge que se puede hacer cumplir;

(b)     SPL es la parte debida para presentar la causa de la acción;

(c)     SPL cumplió con sus obligaciones contractuales;

(d)     Berge incumplió dicho contrato; y

(e)     El incumplimiento de dicho contrato por parte de Berge ocasionó un perjuicio a SPL.

## SEGUNDA CAUSA DE ACCIÓN – QUANTUM MERUIT

45. SPL incorpora los párrafos anteriores 10 a 42 es si se hubiesen incorporado a la presente íntegramente.

46. (a)     SPL proporcionó valiosos servicios a Berge

(b)     Berge aceptó los servicios de SPL; y

(c)     Berge fue avisada con razonable antelación de que SPL esperaba una compensación por los servicios.

xv

## TERCERA CAUSA DE ACCIÓN 3 – FRAUDE

47. SPL incorpora los párrafos anteriores 10 a 42 es si se hubiesen incorporado a la presente
íntegramente.

48. (a)     Berge hizo declaraciones a SPL:

        (i)     declaraciones con respecto a las dimensiones y el peso de la carga;
y

        (ii)    declaraciones con respecto a un acuerdo de pago y el pago actual
de los servicios.

(b)     Estas declaraciones eran falsas;

(c)     Cuando Berge hizo estas declaraciones, Berge

        (i)     sabía que las declaraciones eran falsas, o

        (ii)    hizo las declaraciones imprudentemente, como afirmaciones
positivas, y sin el conocimiento de la verdad;

(d)     Berge hizo estas declaraciones con la intención de que SPL actuase en función de
las mismas;

( e )   SPL confió en estas declaraciones; y

(f)     Estas declaraciones le ocasionaron a SPL un perjuicio.

## DAÑOS Y PERJUICIOS

49. SPL solicita los siguientes daños y perjuicios:

### Incumplimiento de contrato y Quantum meruit

Daños y perjuicios efectivos por importe de 102.359,31 dólares, "costes adicionales"
asociados adeudados por contrato por el importe de 20.471,86 dólares (daños y perjuicios

efectivos totales de 122.831,17 dólares), los honorarios del abogado que se exponen a continuación, intereses antes y después del juicio, y los costas del tribunal.

### Fraude

Daños y perjuicios efectivos por importe de 102.359,31 dólares, "costes adicionales" asociados adeudados por contrato por el importe de 20.471,86 dólares (daños y perjuicios efectivos totales de 122.831,17 dólares), las indemnizaciones punitivas que se establecen a continuación, intereses antes y después del juicio, y las costas del tribunal.

## HONORARIOS DEL ABOGADO

50. De conformidad con la Práctica civil y código de reparaciones de Texas, Capítulo 38, Sección 38.001, SPL puede recuperar los honorarios del abogado de una persona física o moral, además del importe de una demanda válida y las costas, si la demanda se refiere a:

       (1) servicios prestados;

       (4) flete o sobrecargas expresas; o

       (8) un contrato oral o escrito.

SPL inicia esta causa por los honorarios razonables y necesarios de abogados, cuyo importe no se puede determinar en este momento

## INDEMNIZACIONES PUNITIVAS

50. De conformidad con la Práctica civil y código de reparaciones de Texas, Capítulo 41, Sección 41.003(a)(1), SPL puede recuperar indemnizaciones punitivas si este Tribunal dictaminase que Berge ha cometido un fraude con el respaldo de pruebas claras y convincentes. SPL inicia esta causa por indemnizaciones punitivas, cuyo importe será determinado por este Tribunal después de un juicio sobre el fondo de la cuestión.

## PETICIÓN

POR TANTO, EN BASE A LOS SUPUESTOS CONSIDERADOS, Specialized Power Logistics, LLC (SPL), con el debido respeto ruega que, después de un juicio sobre el fondo de la cuestión, este Tribual dicte sentencia a favor de SPL y en contra de Berge Project Cargo, S.L. (BPC) y Berge Shipping (BS), (colectivamente Berge), sobre las causas de acción antes mencionadas, y adjudique a SPL daños y perjuicios efectivos por importe de 122,831.17 dólares, los honorarios de abogado razonables y necesarios, indemnizaciones punitivas, intereses antes y después del juicio a la tasa máxima permitida por la ley, y los costas del tribunal, y cualquier otra reparación con arreglo a la legislación y en equidad a la que SPL tenga derecho con justicia.

Presentada con el debido respeto.

*Edwin K. Nelson, IV*

Texas State Bar No.: 14890600
3814 Sun Valley Drive
Houston, Texas 77025
Teléfono: (713) 668-5100
Fax: (713) 668-5110
E-Mail: seaproctor@hotmail.com

LA PARTE DEMANDANTE

ASISTENCIA LETRADA ACREDITADA DE

SPECIALIZED POWER LOGISTICS, LLC

XVIII


TRANSPERFECT

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATION

I, Wendy Poon, as an employee of TransPerfect Translations, Inc., do hereby certify that, to the best of my knowledge and belief, the provided English into Spanish translation of the below listed document(s) is true and accurate:

- ORIGINALCOMPLAINT.002

TransPerfect Translations, Inc., an international ISO 9001:2008 and EN 15038:2006 certified translation organization with over 55 offices on four continents, is a leader in professional translations. TransPerfect Translations, Inc. has over fifteen years experience translating from and into over 100 languages, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

Moreover, TransPerfect Translations, Inc. affirms that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

Dated: Thursday, August 11, 2016

Sworn to before me this
Thursday, August 11, 2016

Signature, Notary Public

ADRIAN C VOSS
Notary Public - State of New York
No. 01VO6325435
Qualified in New York County
My Commission Expires May 26, 2019

Stamp, Notary Public